1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9          FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   City of Lincoln,                           No. 2:18-cv-00087-KJM-AC

12                    Plaintiff and Counter     ORDER
                      Defendant,
13

14          v.

15   County of Placer, et al.,

16                    Defendant and
                      Counter Claimant.
17

18          The City of Lincoln and the surrounding county, the County of Placer, disagree about who

19   is responsible for cleaning up and monitoring the groundwater near the old landfill that both once

20   used.  The County moves for summary judgment.  As explained in this order, disputes about the

21   County's liability cannot be resolved before trial, so the County is not entitled to summary

22   judgment.  But if the City ultimately proves its claims at trial, the court will equitably allocate the

23   costs the County argues it must.  The court thus **denies in part and grants in part** the

24   County's motions for summary judgment.

25          Two other ancillary motions about the County's affirmative defenses are pending as well.

26   The court **denies** the County's request for leave to assert new immunities at this late stage and

27   **grants** the City's request to strike those new allegations of immunity from the County's answer.

1    **I.    EVIDENTIARY DISPUTES AND OBJECTIONS**

2           Several disputes about what evidence the court should consider are best resolved at the

3    outset.  The judges in this district, including the undersigned, have often cautioned litigants

4    against terse and reflexive evidentiary objections at summary judgment, especially when the

5    objector is the moving party.  *See, e.g.*, *Lindell v. Synthes USA*, 155 F. Supp. 3d 1068, 1071 (E.D.

6    Cal. 2016); *U.S. E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1052–53 (E.D. Cal. 2015);

7    *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126

8    n.1 (E.D. Cal. 2008); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal.

9    2006).  The court encourages counsel to review these orders to avoid unnecessary and

10   unpersuasive objections in the future.

11          Generally, the admissibility of evidence at summary judgment is governed by different

12   rules and different motivations than at trial.  At summary judgment, Rule 56 allows objections to

13   evidence when "the material cited . . . cannot be presented in a form that would be admissible in

14   evidence."  Fed. R. Civ. P. 56(c)(2).  As this language suggests, at summary judgment, the

15   propriety of evidence depends not on its form, but on its content.  *Celotex Corp. v. Catrett*,

16   477 U.S. 317, 324 (1986); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).

17   The party asking the court to consider evidence bears the burden to prove that it could be

18   presented in admissible form.  *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir.

19   2002).  If the opposing party objects, the proponent must direct the court to "authenticating

20   documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or

21   other evidentiary principles under which the evidence in question could be deemed

22   admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  But if

23   evidence falls short of the "formalities of Rule 56," a district court may nonetheless exercise its

24   discretion "to be somewhat lenient."  *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*,

25   5 F.3d 1255, 1261 (9th Cir. 1993).

26          This standard makes some evidentiary objections a poor fit for summary judgment.  That

27   is true first and foremost of form objections and objections based on relevance, vagueness and

28   speculation.  To the extent these objections attack the content of evidence rather than its form,

1    they duplicate Rule 56 itself.  Courts disregard irrelevant, indecipherable or speculative evidence,

2    *see, e.g.*, *Burch*, 433 F. Supp. 2d at 1119, and Rule 56 does not permit litigants to oppose

3    summary judgment on the basis of vague assertions or speculation, *see* Fed. R. Civ. P. 56(c)(1).

4    Likewise, an objection that testimony is argumentative or mischaracterizes the record either calls

5    for a credibility determination unsuited for summary judgment or would better be directed at the

6    underlying evidence itself.  *See, e.g.*, *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d

7    1023, 1034 (C.D. Cal. 2013).  Courts also often overrule hearsay objections at summary

8    judgment.  For example, in reviewing a district court's ruling on summary judgment, the Ninth

9    Circuit has considered the hearsay contents of a diary whose substance would have been

10   admissible in another form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

11   Foundation and authenticity problems similarly are nonfatal if "the substance could conceivably

12   be made admissible at trial."  *Portnoy v. City of Davis*, 663 F. Supp. 2d 949, 953 (E.D. Cal. 2009)

13   (quotation marks omitted).

14          Most of the parties' objections fall within these categories.  *See, e.g.*, City's Resp. Stmt.

15   Facts No. 3, ECF No. 98-2 (objecting to evidence as "immaterial"); County's Resp. Add'l Stmt.

16   Facts No. 1 (arguing evidence mischaracterized).  Because this order rests on only relevant and

17   concrete evidence, the parties' objections based on arguments about irrelevance, vagueness and

18   speculation are moot.  Nor will the court attempt to fill in the legal arguments and citations the

19   parties have omitted.  *Cf.* County's Resp. Add'l Stmt. Facts No. 1 (objecting without elaboration

20   that evidence is inadmissible hearsay).  The court also declines to attempt to discern the

21   justifications for hearsay objections.  Most of the statements in question are not hearsay in any

22   event.  For example, many statements would be excluded from the rule against hearsay under the

23   exception for "ancient documents."  *See, e.g.*, *id.* (objecting to meeting minutes from 1949 as

24   hearsay); *cf.* Fed. R. Evid. 803(16) (excluding from rule against hearsay any "statement in a

25   document that was prepared before January 1, 1998, and whose authenticity is established").  The

26   parties' other objections are otherwise overruled without further discussion.  The court has

27   reviewed all documents and records cited in this order and for each has determined the evidence

1    either would be admissible for the specified purpose or could likely be reduced to an admissible

2    form at trial.

3    **II.    BACKGROUND**

4           The old Lincoln landfill is a six-acre square of grassy land in the low, rolling Sierra

5    Nevada foothills just outside the City.[1]  It has been closed since 1976.  Placer Cty. Resp. Stmt.

6    Facts Nos. 1, 6, ECF No. 98-2.  The City began operating the landfill in the early 1950s, *id.*, but it

7    might have been a "dumping grounds" for some time before then, *see, e.g.*, Placer Cty. Council

8    Meeting Mins. at 2 (Jan. 3, 1949), Orrell Decl. Ex. 1, ECF No. 86-1.  When the landfill was open,

9    it was where the City's garbage haulers dumped whatever refuse they had collected from Lincoln

10   homes and businesses.  *See* City Resp. First Interrogs. at 11–12, Parker Decl. Ex. 1, ECF

11   No. 79-2.

12          People living and working nearby, including people from the rural areas in the

13   surrounding county, also could haul and dump their own waste.  City Answer ¶ 9, ECF No. 11.

14   The County did not operate a nearby landfill of its own.  *See* Cty. Resp. to Req. for Admission

15   Nos. 8, 31–37, Orrell Decl. Ex. 9, ECF No. 86-1.  Instead, it paid the City a fee to ensure County

16   residents from outside Lincoln could use the dump free of charge.  *See, e.g.*, Placer Cty. 1953–

17   1954 Budget, Orrell Decl. Ex. 11 at 9, ECF No. 86-1; Oberholtzer Letter (July 5, 1967), Orrell

18   Decl. Ex. 26, ECF No. 87-1.  The size of that fee was sometimes contentious.  The City often

19   claimed the County was not paying its fair share of the landfill's costs.  In 1962, for example, a

20   city engineer claimed more than half of the traffic to the dump originated outside city limits, and

21   he estimated that forty percent of the waste was from outside Lincoln.  *See* Thompson Letter

---

[1] The court grants the partially unopposed request for judicial notice of these and several other facts about the landfill and its regulatory history, which can readily be verified from publicly available sources and are subject to no reasonable dispute.  *See* Fed. R. Evid. 201(b); Req. J. Not., ECF No. 79-4.  For example, the landfill's location, size, dimensions and other characteristics are summarized in the files from the Central Valley Region of the California Regional Water Control Board.  *See* 1991 WDR, Req. J. Not. Ex. 3, ECF No. 79-4; 1991 MRP, Req. J. Not. Ex. 4, ECF No. 79-4; 2003 WDR, Req. J. Not. Ex. 6, ECF No. 79-4.  The court declines to take judicial of disputed information in those documents not cited here.  Finally, because the County has moved for summary judgment, the evidence summarized in this section is presented in the light most favorable to the City.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

1  (Jan. 5, 1962), Orrell Decl. Ex. 17, ECF No. 86-1.  But later, when the City proposed a fee for

2  out-of-town County residents, the local newspaper reported talk of a boycott, and the City

3  reconsidered.  *See* Orrell Decl. Exs. 30–33, 36, ECF No. 87-1.

4        In paperwork the City sent to state authorities while the landfill was open, it described the

5  landfill's contents as typical of the refuse one might find at the curb in any neighborhood—trash,

6  garbage, paper, leaves, and lawn and tree trimmings.  *See* Applications, Parker Ex. 3, ECF

7  No. 79-2.  But some of those who knew the landfill from that time, including some of the City's

8  former employees, remember more dangerous waste reaching its final resting place in the old

9  dump.  There were cars, batteries, air conditioners, refrigerators and other appliances, for

10  example, and perhaps drycleaning waste as well.  *See* Ojeda Dep. at 191–93, Orrell Decl. Ex. 41,

11  ECF No. 87-1; Pasillas Dep. at 193–94, Orrell Decl. Ex. 42, ECF No. 87-1; Parker Decl. Ex. 2, 4,

12  ECF No. 79-2.  As far as the local authorities can tell, there was no other place nearby designated

13  for locals to discard dangerous waste.  *See* Cty. Resp. to Req. for Admission No. 36, Orrell Decl.

14  Ex. 9, ECF No. 86-1.

15        We know today that hazardous substances are buried in the landfill.  Resp. Add'l Stmt.

16  Fact No. 25, ECF No. 98-5.  Hazardous waste from these substances is in the groundwater below

17  and around the landfill, too.  *See* Cal. Reg'l Water Quality Control Bd., Central Valley Region,

18  Solid Waste Assessment Test Exemption (Jan. 30, 1990), Req. J. Not. Ex. 2 at 2–3, ECF

19  No. 79-4; 2003 WDR at 4, Req. J. Not. Ex. 6 at 14, ECF No. 79-4.  The City hired an

20  environmental engineer, George Savage, to give an opinion about the likely sources of this waste.

21  He believes the substances came both from waste we would think of today as hazardous or

22  dangerous, such as pesticides and solvents, as well as more common garbage we may not

23  necessarily associate with dangerous chemicals, like paper.  Savage Rep. at 2–3, Orrell Decl.

24  Ex. 45, ECF No. 87-1.  Paper was commonly printed with ink that contained lead.  Savage Dep.

25  at 193, Orrell Decl. Ex. 44, ECF No. 87-1.  Whatever the specific sources of these substances

26  might be, however, Savage concluded their route to the landfill was no mystery.  Hazardous

27  substances were in the garbage people put in their cans at home and brought to the landfill on

28  their own.  *See* Savage Rep. at 3.

Problems first arose in the late 1960s, while the landfill was still open, when an inspection by the regional water quality control board revealed that water contaminated by waste within the landfill had seeped into the ground nearby.  Obernholtzer Letter (Nov. 14, 1968), Parker Decl. Ex. 4, ECF No. 79-2.  In 1968, the City said it would keep the landfill trenches above the historic groundwater level around the dump, divert rainfall away from the landfill and not dispose of any wastes containing "liquid or soluble chemicals of a toxic nature."  *Id.*  But the City also made sure to explain it was not currently accepting that type of waste in any event, as far as it knew.  *Id.*  The water board then issued its first set of requirements for discharges from the landfill: (1) no pollution of ground or surface water, (2) no nuisance caused by "odors or unsightliness," (3) no direct discharge of solid or liquid wastes, "including leachate," into the ground or surface water, and (4) no discharge of toxic chemicals.  1968 WDR, Req. J. Not. Ex. 1, ECF No. 79-4.

Many years later, after the landfill closed, a consulting company prepared a report for the City as part of an application for the landfill to be exempted from state law reporting requirements.  *See* Parker Decl. Ex. 2, ECF No. 79-2.  The water board exempted the landfill after it found the City had not knowingly accepted any hazardous waste, but it noted elevated levels of chemicals in the groundwater near the landfill, so it ordered the City to monitor the groundwater.  *See* Crooks Letter (Jan. 30, 1990), Req. J. Not. Ex. 2, ECF No. 79-4.  The next year, the water board rescinded its 1968 order and issued a new set of requirements.  *See generally* 1991 WDR.  These requirements imposed a detailed series of prohibitions and set specific dates for compliance.  *Id.* at 3–8.  It directed the City to monitor chemicals in the groundwater and propose a plan to curb discharges from the landfill.  *Id.* at 4, 7.

Unfortunately, almost ten years after the water board revised its previous discharge requirements for the landfill, tests were still detecting unacceptable levels of chemicals in the surrounding groundwater.  Busby Letter (Feb. 22, 2000), Req. J. Not. Ex. 5, ECF No. 79-4.  The water board directed the City to submit an engineering study and to propose a plan to correct the problem.  *Id.*  Eventually the water board issued a third set of discharge requirements to the City.  *See generally* 2003 WDR.  It appeared that buried waste within the landfill was close to the historic groundwater level, contrary to state regulations.  *Id.* at 4.  The water board ordered the

City to maintain the required five feet of vertical distance between the historic groundwater level and the landfill waste, continue monitoring discharges and satisfy other requirements. *Id.* at 4, 22. The City attempted to comply, but it hit a roadblock: a landowner to the south refused to allow the City's employees and contractors to enter its land to drill and check monitoring wells, as the water board had ordered. *See generally* Orrell Decl. Exs. 82–90, ECF No. 90-1. The City eventually resorted to the courts and eminent domain. *See* Palmer Letter (Aug. 6, 2010), Orrell Decl. Ex. 92, ECF No. 90-1.

By late 2012, the City had finally drilled the last required monitoring well. Leftwich Letter (Nov. 13, 2012), Orrell Decl. Ex. 94, ECF No. 90-1. But the next year, it remained out of compliance with the water board's orders. There were still dangerous chemicals in the water, and the City had not submitted the required engineering study and remedial plans. *See* Cleanup & Abatement Order at 5, Req. J. Not. Ex. 7 at 5, ECF No. 79-4. As a result, in 2014, the water board gave the City six specific directives, each with a deadline. *See id.* at 9–10. If the City did not comply, the case could be referred to the California Attorney General, and the City could face fines of up to $10,000 per violation per day. *Id.* at 11.

The City then submitted a plan. *See* Del Frate Letter (June 11, 2014), Orrell Decl. Ex. 96, ECF No. 90-1. It would dig cutoff trenches around the landfill to depress nearby groundwater levels, collect contaminated groundwater and send that water to a treatment plant. *Id.* The water board approved this plan. *Id.* The City contracted with a construction company to dig the cutoff trench and install the dewatering system. *See* Lincoln City Council Mins. at 6 (June 9, 2015), Orrell Decl. Ex. 100, ECF No. 90-1; Agreement, Orrell Decl. Ex. 101, ECF No. 91-1; Lincoln City Council Resolution No. 2016-51 (Mar. 22, 2016), Orrell Decl. Ex. 104, ECF No. 91-1. The construction company finished the job in early 2016. *See* Notice of Completion (Feb. 23, 2016), Orrell Decl. Ex. 105, ECF No. 91-1. The City also approved a monitoring contract for the wells around the landfill. *See* Lincoln City Council Resolution No. 2016-174 (Sept. 13, 2016), Orrell Dec. Ex. 106, ECF No. 91-1. In their current filings, the parties do not address whether more work will be necessary.

1         The City filed this action against the County in 2018.  *See generally* Compl., ECF No. 1.

2    It claimed the County should bear some responsibility for responding to the problems at the

3    landfill because its residents were responsible for a good portion of the waste that had been buried

4    within the landfill.  *See id.* ¶ 12.  The City pursued claims based on nuisance, trespass, equitable

5    indemnity and contribution, and the federal Comprehensive Environmental Response,

6    Compensation, and Liability Act of 1980 (CERCLA).  *See id.* ¶¶ 15–54.

7         While the case was still in discovery, the County sought judgment on the pleadings.  The

8    court granted that motion in part.  *See generally* Prev. Order (Sept. 15, 2022), ECF No. 62.  It

9    dismissed one of the City's federal claims without leave to amend.  *Id.* at 9.  The court also

10   dismissed the City's state law claims for equitable indemnity and equitable contribution, but with

11   leave to amend.  *Id.*  The City amended its complaint, and the County amended its answer and

12   counterclaims.  *See generally* First Am. Compl., ECF No. 66; Am. Answer & Countercl., ECF

13   No. 67.

14        Discovery has now closed, and four motions are pending, as noted.  The City moves to

15   strike the County's allegation that it is immune to the City's claims.  The City argues the County

16   added that allegation too late and without permission.  The County opposes that motion, but it

17   also seeks leave to amend its answer to assert the disputed immunity as a backstop.  The County

18   also seeks summary judgment in its favor on all the City's claims.  Finally, in the event the

19   County does not obtain summary judgment in full, it seeks partial summary judgment of its own

20   counterclaim, which seeks contribution by the City under CERCLA.  All four motions are fully

21   briefed and were submitted after a hearing over videoconference on March 30, 2023.[2]  Jeffrey

22   Orrell and Charles Grosenick appeared for the City.  Jennifer Hartman King appeared for the

23   County, with Gregory Warner observing.  While the City's counsel suggested at the beginning of

---

[2] *See generally* Mot. Strike, ECF No. 68; Mem. Strike, ECF No. 68-3; Opp'n Strike, ECF No. 70; Reply Strike, ECF No. 82; Mot. Am., ECF No. 73; Mem. Am., ECF No. 73-1; Opp'n Am., ECF No. 76; Reply Am., ECF No. 82; Mot. Summ. J., ECF No. 79; Mem. Summ. J., ECF No. 79-1; Opp'n Summ. J., ECF No. 85; Reply Summ. J., ECF No. 98; Surreply Summ. J., ECF No. 99; Mot. Summ. J. (§ 113), ECF No. 78; Mem. Summ. J. (§ 113), ECF No. 78-1; Opp'n Summ. J. (§ 113), ECF No. 92; Reply Summ. J. (§ 113), ECF No. 97; Hr'g Mins., ECF No. 102.

1   the hearing the parties may be on the verge of settlement, no notice of settlement is on the docket

2   so the court proceeds to issue this order.

3         This is a complex case built on a long historical record and frequently confusing statutory

4   provisions.  As the Ninth Circuit has said, "neither a logician nor a grammarian will find comfort

5   in the world of CERCLA."  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 883 (9th

6   Cir. 2001).  Recognizing that complexity, the court granted the County's emergency, last-minute

7   request to file a twenty-page reply brief in support of its motion for summary judgment, twice as

8   long as the ordinary limit.  *See* Order (Feb. 28, 2023), ECF No. 95; Standing Orders at 4, ECF

9   No. 3.  The County appears, however, to have concluded that twenty pages were not enough.

10  Although its reply brief ends just after the twentieth page, that brief includes many long and

11  argumentative footnotes in much smaller, single-spaced text.  The City took similar liberties in its

12  surreply.  Relegating arguments to the margins of a brief in this way is unfair to one's opposition,

13  particularly after obtaining twice the space on an emergency basis.  The court has disregarded the

14  footnotes in the reply and surreply for these reasons.

15  **III.   THE COUNTY'S IMMUNITY DEFENSES**

16        The court begins with the disputed immunity defenses.  The County's original answer

17  alleged the City's action was barred in part because the City had not presented its damages claim

18  to the County before filing the lawsuit.  *See* Cty. Answer at 8, ECF No. 10 (citing Cal. Gov't

19  Code §§ 905, 945.5).  The County's amended answer added many other immunities under many

20  other sections of the California government code.  *See* Cty. Am. Answer at 8, ECF No. 67.  For

21  example, the County cited Government Code section 815.  Under that section, public entities are

22  not liable for injuries except as authorized by statute.  Cal. Gov't Code § 815(a).  The County also

23  cited section 818.6, which provides a public entity "is not liable for injury caused by its failure to

24  make an inspection, or by reason of making an inadequate or improper inspection, of any

25  property."  The City argues it was too late for the County to assert these many new affirmative

26  defenses in this case.

27        Several rules are at play here.  The first is Rule 16.  Under Rule 16, a district court must

28  issue a scheduling order, and that order "may be modified only for good cause and with the

1  judge's consent." Fed. R. Civ. P. 16(b)(1), (4).  The court issued a scheduling order for this case

2  in June 2018.  ECF No. 16.  It permitted no further amendments to the pleadings "without leave

3  of court, good cause having been shown."  *Id.* at 2.  The "pleadings" include the answer to a

4  complaint, Fed. R. Civ. P. 7(a)(2), so the court's scheduling order limited the County's ability to

5  amend its answer.  And despite several amendments to that scheduling order, the general deadline

6  for amendments to the pleadings was unchanged.  *See, e.g.*, Stip. & Order, ECF No. 83

7  (discussing changes to scheduling order).  For these reasons, the County could amend its answer

8  only after obtaining the court's leave and showing good cause.

9        The "good cause" requirement focuses primarily on the party's diligence and its reasons

10  for not acting sooner.  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th

11  Cir. 2013) (citing *Johnson v. Mammoth Recreations Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)),

12  *aff'd on unrelated question sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015).  The

13  County did not act diligently.  It attempted to add its new defenses more than four years after this

14  case began, and it is unclear why it could not or did not assert those immunities at the outset.

15        The County cites a 2019 decision by the California Supreme Court to explain its delay.

16  *See* Mem. Am. at 7 (citing *Quigley v. Garden Valley Fire Prot. Dist.*, 7 Cal. 5th 798 (2019)).  In

17  *Quigley*, the state supreme court clarified that Government Code immunities are affirmative

18  defenses that must be pleaded and proved.  7 Cal. 5th at 802–03.  But *Quigley* was decided in

19  2019, and the County did not file its amended answer until late 2022.  As confirmed at hearing, it

20  did not even raise the possibility of a new immunity defense until late 2021.  *See* Lungren Decl.

21  ¶ 4 & Ex. B at 2, ECF No. 73-2 (attaching letter dated December 2021).  Because the County has

22  not acted diligently, it has not shown good cause to modify the scheduling order, so that

23  scheduling order remains in effect, and under Rule 16 the County may not proceed on the

24  immunity defenses it asserted in its answer without the court's approval.

25        Under the second rule at play in the City's motion, however, the County might be able to

26  assert its immunity defenses at the summary judgment stage even if they are not allowed in its

27  answer.  The Ninth Circuit long ago "liberalized the requirement that affirmative defenses be

28  raised in a defendant's initial pleading."  *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984)

1    (citing *Healy Tibbitts Const. Co. v. Ins. Co. of N. Am.*, 679 F.2d 803, 804 (9th Cir. 1982) (per

2    curiam)).  A defendant may assert an affirmative defense at the summary judgment stage—even if

3    that defense was not in its answer—unless the plaintiff would suffer prejudice as a result of the

4    delay.  *Garcia v. Salvation Army*, 918 F.3d 997, 1008–09 (9th Cir. 2019).  It is not enough for the

5    plaintiff to say the new defense might be decisive; after all, the new defense might have ended the

6    case right away if the defendant had included it in its answer.  *See Owens v. Kaiser Found. Health*

7    *Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).  The plaintiff must "point to a 'tangible way in

8    which it was prejudiced by the delay.'"  *Garcia*, 918 F.3d at 1008 (quoting *Ledo Fin. Corp. v.*

9    *Summers*, 122 F.3d 825, 827 (9th Cir. 1997)).

10        The City argues persuasively that the late addition of new immunity defenses would

11    prevent it from conducting discovery into those defenses, unless the court reopened discovery.  It

12    cites the trespass claim as an example.  *See* Mem. Strike at 7 & n.4.  For that claim, if the County

13    is permitted to proceed on its new immunity defenses, it could argue County employees are "not

14    liable for an injury arising out of [their] entry upon any property where such entry is expressly or

15    impliedly authorized by law."  Cal. Gov't Code § 821.8.  If the City believed it could defeat that

16    assertion of immunity by arguing the employees exceeded their authority or acted negligently, *see*

17    *id.*, it would likely lack evidence to cite, *see* Mem. Strike at 7 & n.4.  Even if discovery were

18    reopened to permit a limited investigation, the parties' experts would likely need to check

19    whether their opinions remained viable in light of new factual information.  More time for

20    discovery would also probably result in more pretrial motion practice, as is evident from the

21    County's responses to the City's last-minute attempts to obtain information from the County

22    about its immunity defenses.  The County responded mostly with objections, refusing to produce

23    documents, and the discovery deadline then passed.  *See* Grosenick Decl. ¶¶ 5–6, Exs. D–E, ECF

24    Nos. 72-1, 72-5, 72-6.  Allowing new immunity defenses in the case at this late stage would cause

25    delays or prejudice or both.

26        Finally, under a third relevant rule, which the County emphasized at hearing, some district

27    courts have allowed defendants to amend their answers without first seeking permission after a

28    plaintiff amends its complaint.  *See, e.g.*, *Coppola v. Smith*, No. 11-1257, 2015 WL 2127965, at

*2–3 (E.D. Cal. May 6, 2015) (surveying cases).  The most permissive of these decisions allow defendants to assert whatever defenses and counterclaims they like after a complaint is amended, even with a trial close at hand.  *See, e.g.*, *Digital Priv., Inc. v. RSA Sec., Inc.*, 199 F. Supp. 2d 457, 459 n.2 (E.D. Va. 2002), *appeal dismissed*, 56 F. App'x 497 (Fed. Cir. 2003).  "The philosophy underlying this approach appears to be that plaintiffs amend their complaint at their peril, opening themselves up to any and all counterclaims the defendants choose to assert."  *Coppola*, 2015 WL 2127965, at *2 (quoting *S. New England Tel. Co. v. Global NAPS, Inc.*, 2007 U.S. Dist. LEXIS 10421, at *6 (D. Conn. Feb. 14, 2007)).

Many district courts have elected not to take such a permissive tack.  "If every amendment, no matter how minor or substantive, allowed defendants to assert counterclaims or defenses as of right, claims that would otherwise be barred or precluded could be revived without cause.  This would deprive the Court of its ability to effectively manage the litigation."  *E.E.O.C. v. Morgan Stanley & Co.*, 211 F.R.D. 225, 227 (S.D.N.Y. 2002).  District courts have more commonly restricted defendants to amend their answers only when the plaintiff has changed "the theory or scope of the case," and even then, courts have limited defendants to amendments that "reflect the breadth of the changes in the amended complaint."  *Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 11 F. Supp. 3d 622, 632 (E.D. Va. 2014) (quoting *Elite Ent., Inc. v. Khela Bros. Ent.*, 227 F.R.D. 444, 446 (E.D. Va. 2005)).

The Ninth Circuit does not appear to have addressed the issue.  *See Coppola*, 2014 WL 2127965, at *3.  Having reviewed the available persuasive authority, the court adopts the more "moderate" view, which is also the majority view: a defendant may amend its answer without first seeking leave of court in response to an amended complaint, provided the amended complaint changes the theory or scope of the case, and in this scenario the defendant's amendments may address only that changed theory or scope.

Here, the City's amended complaint did not change the theory or scope of its case.  The court permitted a narrow amendment only, and the City narrowed its case in response.  It left out one of the dismissed claims.  The County's new immunity defenses go beyond those changes and the amended claim.  For these reasons, the court **grants** the City's motion to strike the County's

second affirmative defense for government immunity and **denies** the County's motion for leave to amend its answer.

## IV.   SUMMARY JUDGMENT

### A.   Legal Standard

Although the parties agree about the basic legal standard for summary judgment motions, they disagree about what they must cite and prove.  For that reason, it will be helpful to begin with a more detailed review of the burdens the City and County must carry at the summary judgment stage.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita*, 475 U.S. at 587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The party moving for summary judgment must first carry its initial burden of production.  *See Celotex*, 477 U.S. at 325; *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party would not have the burden to prove the disputed claim or defense at trial, then it may carry its initial burden of production at summary judgment in one of two ways: "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102.  Then, to carry its burden of persuasion on the motion, the moving party must "persuade the court that there is no genuine issue of material fact."  *Id.*  If, by contrast, the moving party would have the burden to prove the disputed claim or defense at trial, then it must cite portions of the record to show "no reasonable jury" could find in favor of the nonmoving party.  *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 (9th Cir. 1997).  The moving party must "establish beyond

controversy every essential element" of that claim or defense.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (per curiam), *adopting* 202 F. Supp. 2d 1129 (C.D. Cal. 2002).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102–03.  If, however, the moving party does carry its initial burden of production, the nonmoving party must produce evidence to support its claims or defenses and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.  But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322).

The City argues the County has not carried its initial burden of production.  For example, it repeatedly faults the County for not reproducing the language of specific interrogatory requests or citing specific discovery responses.  *See, e.g.*, Opp'n Summ. J. at 3–4, 6–7.  These arguments rely on an incorrectly narrow conception of the Supreme Court's and Ninth Circuit's decisions.  The Supreme Court has held unambiguously that a moving party may prevail at summary judgment by showing the nonmoving party could not carry its ultimate burden at trial.  *See Celotex*, 477 U.S. at 322.  To be sure, a moving party that would not have the ultimate burden of persuasion at trial cannot "use a summary judgment motion as a substitute for discovery." *Nissan Fire*, 210 F.3d at 1105.  "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.* (quoting *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).  But the Supreme Court and Ninth Circuit have demanded neither granular recitations of discovery responses nor affirmative proof that discovery was adequate.

In *Celotex*, for example, the plaintiff claimed her husband had died from exposure to the defendant's asbestos.  *See* 477 U.S. at 319–20.  The manufacturer moved for summary judgment after discovery, citing the plaintiff's failure to respond to an interrogatory with the names of any

1 | witnesses who could testify about her husband's exposure.  *Id.*  The district court granted the

2 | motion because "there was no showing that the plaintiff was exposed."  *Id.* at 320.  The court of

3 | appeals reversed because the defendant had not relied on "any evidence, in the form of affidavits

4 | or otherwise."  *Id.* at 321 (emphasis omitted).  The Supreme Court rejected that reasoning: "the

5 | burden on the moving party may be discharged," it wrote, "by 'showing'—that is, pointing out to

6 | the district court—that there is an absence of evidence to support the nonmoving party's case."

7 | *Id.* at 325.  The Court remanded the case for the lower courts to decide whether there was any

8 | genuine dispute about asbestos exposure.  *See id.* at 327.

9 |      In this case, because the parties have had an adequate opportunity for discovery, when the

10 | City will ultimately be charged with the burden of proof at trial, the County can simply "point

11 | out" the absence of any evidence, such as the missing witnesses, documents or expert opinions,

12 | that would be necessary to prove the City's claim.  The court begins with the City's claim under

13 | CERCLA section 107.

14 |      **B.**    **The City's CERCLA Section 107 Claim**

15 |      "CERCLA . . . was enacted in 1980 'to provide for liability, compensation, cleanup, and

16 | emergency response for hazardous substances released into the environment and the cleanup of

17 | inactive hazardous waste disposal sites.'"  *Carson Harbor Vill. v. County of Los Angeles*,

18 | 433 F.3d 1260, 1265 (9th Cir. 2006) (quoting Pub. L. No. 96-510, 94 Stat. 2767 (1980)).  It

19 | creates "a comprehensive scheme for the cleanup of hazardous waste sites," and it "imposes

20 | liability for cleanup costs on the parties responsible for the release or potential release of

21 | hazardous substances into the environment."  *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d

22 | 1066, 1072 (9th Cir. 2006).  Section 107(a) of CERCLA, now found in 42 U.S.C. § 9607(a),

23 | allows an entity that has incurred cleanup costs to recover those costs from others who

24 | contributed to the release of hazardous wastes.  The elements of a claim under section 107(a) are

25 | well known and, for the most part, are not disputed in this case.  A plaintiff must show:

26 |      (1)    The waste disposal site is a "facility" under the statutory definition;

27 |      (2)    There has been a "release" or "threatened release" of a "hazardous substance"

28 |           from that site;

(3)     That release or threatened release has caused the plaintiff to incur certain costs; and

(4)     The defendant falls within a category of people defined in the statute, i.e., current owners and operators, former owners and operators, "arrangers," and "transporters."

*See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989). The County does not dispute the City could prove the landfill is a "facility" and a "hazardous substance" was "released" from the landfill. The County rather focuses on the third and fourth elements. It contends the City cannot show its response costs are actually attributable to the release of any "hazardous substances" from the landfill; the County also argues it is not a current or former owner, operator, arranger or transporter.

The County's causation arguments can be rejected without difficulty, but a few additional details about the chemicals found near the landfill are necessary to explain why. Some of these chemicals are known generally as "chlorides" and "dissolved solids." *See, e.g.*, Crooks Letter (Jan. 30, 1990), Req. J. Not. Ex. 2, ECF No. 79-4. A "chloride" is not necessarily a dangerous thing, depending on the dose. Table salt is sodium chloride. In the context of this case, the danger comes from other substances that can dissolve in water, like heavy metals and industrial solvents. *See* Savage Rep. at 9–10. One measurement of the solids dissolved in a specific sample of water is the "total dissolved solids" or "TDS," that is, the solids that remain in a sample after it is passed through a very fine filter. *See id.* at 9. California regulates these solids in water around landfills. *See, e.g.*, Crooks Letter (Jan. 30, 1990); Cal. Water Code § 13273.1. A landfill owner like the City need not remove dissolved solids completely, but it must reduce them to acceptable background levels. *See, e.g.*, 2003 WDR at 14.

"Volatile organic compounds" or "VOCs" are another category of substances that have been detected in and around the landfill. *See, e.g.*, Cleanup & Abatement Order at 1, 3. Many VOCs are produced in the manufacturing of paints, pharmaceuticals and refrigerants, and they are typically used as industrial solvents. U.S. E.P.A., "What Are Volatile Organic Compounds

1   (VOCs)" (Mar. 15, 2023).[3]  According to the U.S. Environmental Protection Agency, human

2   exposure to some VOCs can have long-term negative health consequences.  *Id.*  The water board

3   has determined no background level of VOCs is acceptable for the groundwater near the landfill;

4   the only acceptable level is zero or "non-detect."  *See* 2003 WDR at 27–28.

5          The parties agree the chlorides and dissolved solids found in the groundwater near the old

6   landfill here are not "hazardous substances" for purposes of the City's CERCLA claims.  The

7   parties also agree VOCs are "hazardous substances" under CERCLA.  *See* Mem. Summ. J. at 6

8   n.1; Opp'n Summ. J. at 2 n.3.  As a result, if the City's response costs are solely attributable to

9   chlorides and dissolved solids—and not to VOCs—then it could not recover its response costs

10  from the County.  The County argues that is the case.

11         VOCs were first detected in the groundwater near the landfill in 1989.  *See* 2003 WDR at

12  4; Cleanup & Abatement Order at 1.  Despite that early detection, the water board did not require

13  the City to monitor the groundwater for VOCs or to undertake any efforts to prevent the landfill

14  from releasing VOCs.  *See* 2003 WDR at 4.  In later years, however, VOCs were detected near

15  the landfill again.  *See, e.g.*, Cleanup & Abatement Order at 3.  The water board then ordered the

16  City to remove VOCs from the groundwater.  Under the water board's orders, "[a] detection of a

17  VOC is a violation of the WDRs."  *Id.*  For that reason, at least some of the City's response costs

18  could potentially be tied to the release of VOCs from the landfill.

19         This genuine dispute—whether the City's response costs are tied to the release of VOCs—

20  precludes the County from obtaining summary judgment based on causation.  As a result, the

21  County is not entitled to summary judgment on the City's section 107(a) claim unless the County

22  is not within any of the four categories of persons or entities who can be liable under that section.

23  Two of those categories might encompass the County.

24         First, the City argues the County is liable as an "arranger."  Arrangers are the third

25  category of defendants who can be liable for response costs under section 107(a).  CERCLA

26  defines arranger liability in section 107(a)(3): an entity is liable if it "by contract, agreement, or

---

[3] https://www.epa.gov/indoor-air-quality-iaq/what-are-volatile-organic-compounds-vocs (last visited Apr. 3, 2023).

1   otherwise arranged for disposal or treatment, or arranged with a transporter for transport for

2   disposal or treatment, of hazardous substances owned or possessed by such person, by any other

3   party or entity, at any facility or incineration vessel owned or operated by another party or entity

4   and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). The Ninth Circuit has held

5   persons "may be liable under § 9607(a)(3) if they arrange for disposal of their own waste or

6   someone else's waste." *Pakootas*, 452 F.3d at 1082. For that reason, the County's argument—

7   that because it did not own the garbage deposited in the landfill, it is not an "arranger"—is

8   unavailing. *See, e.g.*, Mem. Summ. J. at 9. The County can be liable for arranging to dispose of

9   waste it did not own.

10          The County's next argument rests on the meaning of the word "arrange" itself. CERCLA

11  does not define that word, and section 107(a)(3) has often vexed federal courts. One Ninth

12  Circuit panel even said it "does not make literal or grammatical sense as written." *Pakootas*,

13  452 F.3d at 1080. As relevant in this case, there are two possible interpretations of section

14  107(a)(3). First, it could mean an "arranger" must intend to dispose of a substance it knows or

15  has reason to believe is "hazardous." Second, it could mean an "arranger" must intend to dispose

16  of a substance, and that substance must be "hazardous." The County urges this court to adopt the

17  first interpretation. As explained below, however, CERCLA's statutory text, structure, remedial

18  purpose and retroactive nature lead the court to adopt the second interpretation. An alleged

19  "arranger" need not have any specific state of mind about whether a particular substance is

20  hazardous or dangerous to be liable under section 107(a)(3).

21          The County, in its briefing and at hearing, relies heavily on the Supreme Court's opinion

22  in *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599 (2009). In

23  *Burlington Northern*, the Supreme Court described a spectrum of potential defendants who might

24  face claims under section 107(a)(3). At one end, an entity would certainly be liable as an arranger

25  if it entered some transaction "for the sole purpose of discarding a used and no longer useful

26  hazardous substance." *Id.* at 609–10. At the other end, "an entity could *not* be held liable as an

27  arranger merely for selling a new and useful product if the purchaser of that product later, and

28  unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* at 610

1  (emphasis added).  For cases between these two extremes, the Supreme Court required some

2  intentional act before a party can be liable: "an entity may qualify as an arranger under

3  § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Id.* at 611.

4         The Supreme Court's decision in *Burlington Northern* might at first glance appear to

5  support the County's proposed interpretation.  The Court held that Congress required "action

6  directed to a specific purpose," i.e., taking "intentional steps to dispose of a hazardous substance."

7  556 U.S. at 611 (emphasis added).  It could be inferred from this sentence that a defendant must

8  have intended specifically to dispose of a hazardous substance, not just any substance.  If not,

9  then why did the Court use the adjective "hazardous"?  The Court could instead have required

10  "intentional steps to dispose of a substance."  *See, e.g.*, *Town of Islip v. Datre*, 245 F. Supp. 3d

11  397, 423 (E.D.N.Y. 2017) (drawing this inference).  But this reasoning places too much emphasis

12  on one word in one sentence.  The Supreme Court said nothing else about what a party must

13  know of a particular substance.  In fact, the Court sometimes omitted the word "hazardous,"

14  suggesting the word itself played no crucial role.  *See, e.g.*, 556 U.S. at 611 ("The Governments

15  do not deny that the statute requires an entity to 'arrang[e] for' disposal . . . .").  When the Court

16  did mention knowledge, it referred only to knowledge about what would happen with the

17  substance, not whether the substance was hazardous.  *See, e.g.*, *id.* at 612.

18         There also is an obvious alternative explanation for why the word "hazardous" appears in

19  the Supreme Court's opinion.  In every case against an alleged arranger, the plaintiff must plead

20  and prove the defendant disposed of a "hazardous substance."  *See Ascon Props.*, 866 F.2d at

21  1152.  Otherwise there would be no reason to sue.  By using the word "hazardous," the Supreme

22  Court was not announcing any holding, not even implicitly.  It was using the words any party uses

23  in an "arranger" case.  If the Supreme Court had intended to limit liability to those who knew they

24  were dealing with hazardous substances, it could have written that the alleged arranger must have

25  taken "intentional steps to dispose of a substance it knew to be hazardous."  It did not, and so the

26  word "hazardous" in the opinion holds no great weight.

27         The County also cites the Ninth Circuit's decision in *Team Enterprises, LLC v. Western*

28  *Investment Real Estate Trust*, 647 F.3d 901 (9th Cir. 2011).  In *Team Enterprises*, the plaintiff

1   alleged the manufacturer of a wastewater distiller was liable as an "arranger" under CERCLA.

2   *See id.* at 906–07.  The distiller removed most but not all of a hazardous solvent from drycleaning

3   wastewater for reuse.  *See id.* at 906.  A drycleaner then washed the remainder down the drain,

4   eventually contaminating the affected property.  *See id.*  The Ninth Circuit applied the rule

5   described in *Burlington Northern* and held the manufacturer was not liable as an arranger.  The

6   distiller's design did not show the manufacturer intended for the solvent to be discarded.  *Id.* at

7   909.  The distiller reduced the amount of discarded solvent.  *Id.*  The circuit could not infer any

8   intent to dispose from the manufacturer's failure to warn the drycleaner about risks of wrongful

9   disposal.  *Id.* at 909-10.  Nor had the manufacturer exercised any control over the disposal.  *Id.* at

10   910–11.  It never touched the solvent.  *Id.*  Finally, no evidence showed the manufacturer's

11   employees had themselves poured the solvent down the drain.  *Id.* at 911.

12          The Circuit's decision in *Team Enterprises* did not turn on whether the manufacturer—or

13   anyone, for that matter—knew whether the solvent was dangerous.  It did not consider whether an

14   alleged arranger must know anything in particular about the discarded substances.  The question

15   was instead whether the manufacturer had intended for the solvent to be disposed.  It had not.  It

16   had sold a useful distiller and was at most "indifferent" about what happened to the solvent's

17   eventual fate, *id.* at 909, so it was not liable.  For that reason, *Team Enterprises*, like *Burlington*

18   *Northern*, offers relatively little guidance in this case.

19          The same is true of several other decisions from outside the Ninth Circuit, including many

20   the parties cite.  Courts often have assumed the waste or product was hazardous without

21   interrogating the alleged arranger's beliefs about it.  *See, e.g.*, *Consolidation Coal Co. v. Georgia*

22   *Power Co.*, 781 F.3d 129, 149 (4th Cir. 2015); *United States v. Gen. Elec. Co.*, 670 F.3d 377,

23   383–84 (1st Cir. 2012).  At most, knowledge that a substance was hazardous has been a useful

24   indicator of what the defendant intended to do with that substance.  *See, e.g.*, *Morton Int'l, Inc. v.*

25   *A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003) (holding before *Burlington Northern* that

26   "proof of a defendant's knowledge that hazardous waste can or will be released in the course of

27   the process it has arranged for, provides a good reason to hold a defendant responsible because

20

1    such proof demonstrates that the defendant knowingly (if not personally) contributed to the

2    hazardous-waste contamination.").

3           In sum, the parties have identified no controlling authority that resolves the ambiguity in

4    section 107(a)(3), and the court's own searches have yielded none.  Because the court must be

5    clear on what the statute means to decide the pending motion, it court turns to the language of the

6    statute itself.  *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108

7    (1980) ("We begin with the familiar canon of statutory construction that the starting point for

8    interpreting a statute is the language of the statute itself.").  As noted above, section 107(a) is

9    notoriously difficult to parse.  *See Pakootas*, 452 F.3d at 1079–80.  True to that reputation, the

10   language of section 107(a)(3) specifically offers no great insights.  For convenience, here is that

11   text once more:

12               [A]ny person who by contract, agreement, or otherwise arranged for
13               disposal or treatment, or arranged with a transporter for transport for
14               disposal or treatment, of hazardous substances owned or possessed
15               by such person, by any other person or entity, at any facility or
16               incineration vessel owned or operated by another party or entity and
17               containing no such hazardous substances . . . shall be liable . . . .

18   42 U.S.C. § 9607(a)(3).  This language does not offer a straightforward answer.  Like the

19   Supreme Court's opinion in *Burlington Northern*, section 107(a)(3) refers to "hazardous

20   substances."  But again, that reference does not end the inquiry.  After all, an entity can be liable

21   as an arranger only if it arranged for the disposal of a substance that is hazardous—not if it

22   arranged for the disposal of a substance that later turns out to be healthy or benign.  It is not

23   difficult to imagine how Congress could have written section 107(a)(3) if it had intended to

24   require some knowledge of the substance's hazardous nature.  For example, it could have made a

25   person liable "who by contract, agreement, or otherwise arranged for disposal or treatment of

26   substances it knew or should have known were hazardous."  But it did not.

27          Section 107(a), like any other statute, also must "be read as a whole."  *United States v. Atl.*

28   *Rsch. Corp.*, 551 U.S. 128, 136 (2007) (quoting *King v. St. Vincent Hosp.*, 502 U.S. 215, 221

29   (1991)).  If anything, the broader structure of section 107(a) suggests a lack of knowledge about a

30   hazardous substance is no defense.  Congress included a specific list of defenses in section

107(b), and a lack of knowledge is not among them.  Congress also clearly was willing to impose liability without regard to whether a defendant knew a substance was hazardous.  It made owners and operators liable without mentioning their knowledge, intentions or state of mind.  *See* 42 U.S.C. § 9607(a)(1).  As the Supreme Court has said, section 107(a) is a "strict liability statute."  *Atl. Rsch.*, 551 U.S. at 136.  When section 107 does mention knowledge, it does so only to explain the amount of a person's liability.  A person must be held liable for the "full and total costs of response and damages" if the release "was the result of willful misconduct or willful negligence within the privity or knowledge of such person."  *Id.* § 9607(c)(2)(A)(i).  This provision suggests an entity could be liable, but only in part, if it acted without any knowledge about hazardous substances.  Although these provisions weigh against the County's proposed interpretation, they do not clear up the murky text of section 107(a)(3).  As a result, section 107(a)(3) is ambiguous when it comes to an alleged arranger's knowledge or intentions about whether a substance is hazardous.

When a statute is ambiguous, its legislative history might help to show what Congress intended.  *In re Bankr. Est. of MarkAir, Inc.*, 308 F.3d 1038, 1043 (9th Cir. 2002).  Neither party has pointed to any relevant legislative history, and the court is not aware of any.  Other federal district courts have considered Congress's possible purposes.  Some have emphasized one purpose of section 107(a)(3) is to prevent "responsible parties from 'contracting away' their liability and deterring them from attempting to do so."  *Islip*, 245 F. Supp. 3d at 423 (quoting *Appleton Papers*, 2012 WL 270492, at *11).  But for the most part, these courts have not supported that conclusion with citations to CERCLA's legislative history or structure.  Their decisions instead often trace back to the very same paragraph in *Burlington Northern*, where the Supreme Court observed "CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance."  *See Appleton Papers*, 2012 WL 270492, at *11 (citing *United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012), in turn citing *Team Enters.*, 647 F.3d at 907, in turn citing *Burlington Northern*, 556 U.S. at 610).  As explained above, the Supreme Court was not excluding other types of arrangements or purposes when it wrote that sentence.  The Court

1    actually was doing the opposite: setting the stage for its explanation why other types of

2    arrangements also could lead to liability under section 107(a)(3).

3          In other words, a person cannot avoid liability by cleverly contracting, but an attempt to

4    contract away liability is not the only way to be liable under section 107(a).  The legislative

5    history supports that conclusion.  For example, according to a Senate Report, lawmakers intended

6    to prevent people from unloading hazardous waste onto another and then pointing fingers.  *See,*

7    *e.g.*, S. Rep. 96-848, 96th Cong., 2d Sess. at 31 (July 11, 1980).  But the same report explains

8    specifically in the same sentence that section 107(a) imposes "strict liability."  *Id.*

9          Congress also expressed some intentions in a general statement of purpose.  CERCLA's

10   first sentence explains it is meant "to provide for liability, compensation, cleanup, and emergency

11   response for hazardous substances released into the environment and the cleanup of inactive

12   hazardous waste disposal sites."  Pub. L. No. 96–510, 94 Stat. 2767 (1980)).  This statement

13   suggests Congress did not intend primarily to punish those who knew the substances they were

14   releasing were hazardous or to deter potential violators, but rather to ensure that after hazardous

15   substances are released, there is liability, compensation, cleanup and an emergency response.  The

16   "overwhelming" majority of federal courts thus has refused to excuse defendants from CERCLA

17   liability just because a particular chemical was not officially "hazardous" at the time it was

18   disposed.  *City of Las Cruces v. Lofts at Alameda, LLC*, 591 F. Supp. 3d 1038, 1048 (D.N.M.

19   2022).

20         In short, CERCLA is a remedial statute.  It applies retroactively.  *Id.* (collecting authority).

21   And its remedial function would be thwarted, not advanced, by paring down the scope of liability

22   it establishes.  In the absence of any other indication of the reasons for Congress's adoption of

23   section 107(a)(3), the court hesitates to impose specific intent requirements in this case.  After all,

24   section 107(a)(3) "must be given 'a liberal judicial interpretation . . . consistent with CERCLA's

25   overwhelmingly remedial statutory scheme."  *Cadillac Fairview/Cal., Inc. v. United States*,

26   41 F.3d 562, 565 n.4 (9th Cir. 1994) (per curiam) (quoting *United States v. Aceto Agric. Chem.*

27   *Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989)).

If the court were to impose a judicially created specific knowledge or intent requirement, the practical consequences would reinforce the conclusion regarding CERCLA's fundamentally remedial nature.  Because CERCLA applies retroactively, it would make little sense to require plaintiffs to prove the arranger intended specifically to dispose of a hazardous substance without exception.  *See Las Cruces*, 591 F. Supp. 3d at 1047.  When district courts have looked for allegations and evidence about an arranger's knowledge, they have not demanded actual knowledge only; they have permitted plaintiffs to show the alleged arranger should have known the substance was hazardous.  *See, e.g.*, *id.*; *Appleton Papers*, 2012 WL 2704920, at *10.  But district judges are rarely experts in chemistry or environmental engineering.  As a result, they often have resorted to somewhat crude indicators of what is likely "hazardous" and what is not.  For example, does the substance have an "obnoxious odor"?  *See Las Cruces*, 591 F. Supp. 3d at 1047.  Does it make one feel "high" when breathing its vapors?  *See id.*  Is it kept in large, intimidating drums?  *See Appleton Paper*, 2012 WL 2704920, at *11.  Does the seller have a history of environmental contamination?  *See Town of Islip*, 245 F. Supp. 3d at 425.  Or was its price so low as to suggest foul play?  *See id.*  The answers to these questions might serve as a proxy for knowledge and intent.  But they also may not.  Not all smelly substances are toxic, many substances that alter the mind are not "hazardous," and not all 55-gallon drums hold toxic solvents.  Deciding on an appropriate measure for a person's state of mind is a question of policy, and the answer requires expertise.  Congress is best suited to this task.

For these reasons, the court declines to infer that an "arranger" under section 107(a)(3) must have any specific state of mind about whether a particular substance is hazardous or dangerous.  By its own terms, section 107(a)(3) imposes liability on those who arrange for the disposal of hazardous substances regardless of whether they knew or should have known those substances were hazardous at the time.  The court recognizes this interpretation runs contrary to that espoused by several other federal district courts.  *See, e.g.*, *Las Cruces*, 591 F. Supp. 3d at 1047; *68th St. Site Work Grp. v. Airgas, Inc.*, No. 20-3385, 2021 WL 4255030, at *20–23 (D. Md. Sept. 16, 2021); *Town of Islip*, 245 F. Supp. 3d at 423–25; *Appleton Papers*, 2012 WL 2704920, at *11–12.  If any court's interpretation is not what Congress intended, it may revise section

1   107(a)(3).  This court will not add conditions to the statute when the statute's text does not

2   provide for them.

3          In conclusion, the City has cited evidence that could potentially show the County arranged

4   for the disposal of hazardous waste at the landfill, so the County is not entitled to summary

5   judgment on arranger liability.

6          In addition to section 107(a)(3) and the County's liability as an "arranger," the City

7   invokes section 107(a)(4), the last CERCLA category for responsible persons: transporters.  It

8   argues the County "accepted" hazardous waste "for transport" to the landfill "for disposal" under

9   section 107(a)(4).  The City has cited evidence that could show the County patrolled its roads and

10  hauled garbage to the landfill in Lincoln.  *See, e.g.*, Orrell Decl. Ex. 38 (reporting County Health

11  Department took garbage from alongside county roads to landfill in 1950s); Holdstock Dep. at

12  149, Orrell Decl. Ex. 39, ECF No. 87-1 (testifying dumping trash on roadside "was a very

13  common thing"); Orrell Dec. Ex. 54 at 1, ECF No. 88-1 (record of County Board of Supervisors

14  meeting about accumulation of trash along county roads when landfill was closed).  That

15  evidence might suffice at trial to show the County transported at least some waste to the landfill

16  for disposal under CERCLA.  Here as well the County has not shown it is entitled to summary

17  judgment in the face of transporter claims under section 107(a)(4).  *See Adickes*, 398 U.S. at 157–

18  59.  The court **denies** the County's motion for summary judgment on the City's claim under

19  section 107.

20          **C.    The City's Nuisance Claim**

21          Under the California Civil Code, "*Anything* which is injurious to health . . . or is indecent

22  or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the

23  comfortable enjoyment of life or property . . . is a nuisance." *County of Santa Clara v. Atl.*

24  *Richfield Co.*, 137 Cal. App. 4th 292, 305 (2006) (alterations and emphasis in original) (quoting

25  Cal. Civ. Code § 3479).  Groundwater contamination is a nuisance per se.  *See* Cal. Water Code

26  §13050(m); *Redevelopment Agency of City of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 673 (9th

27  Cir. 2011).  "[L]iability for nuisance does not hinge on whether the defendant owns, possesses or

28  controls the property, nor on whether he is in a position to abate the nuisance; the critical question

25

1   is whether the defendant *created or assisted in the creation of the nuisance*." *Atl. Richfield Co.*,

2   137 Cal. App. at 306 (quoting *City of Modesto Redevelopment Agency v. Superior Court*,

3   119 Cal. App. 4th 28, 38 (2004)) (emphasis and alteration in *Santa Clara*).  The question is not

4   whether the defendant's actions were reasonable.  *BNSF*, 643 F.3d at 673.  "An intentional but

5   not unreasonable *act* can give rise to nuisance liability if it creates an unreasonable *interference*."

6   *Id.* (emphasis in original).

7        The City has cited evidence that could show the County affirmatively contributed to the

8   creation of groundwater contamination, a nuisance.  As summarized above, the record would

9   permit a reasonable jury to conclude the County paid the City an annual fee for many years in

10  exchange for the promise that County residents could leave their waste at the landfill, residents

11  did in fact leave waste at the landfill, and the groundwater has been contaminated by waste in the

12  landfill.  The County argues this evidence is irrelevant because the landfill closed in the 1970s,

13  before the water board discovered chlorides, dissolved solids and VOCs in the surrounding

14  groundwater.  Mem. at 15.  What others knew about the landfill is hardly proof of what the

15  County knew, but even in the 1960s, the water board had discovered that waste had contaminated

16  the nearby groundwater.  *See* 1968 WDRs.

17       The City also has cited evidence that could show the County acted as an authority over the

18  landfill's safety, both in the 1960s and later on, which could allow a reasonable fact-finder to

19  conclude the County knew or should have known it was contributing to a nuisance.  For example,

20  the County's health officer served as the City's health officer as early as the 1940s.  Placer Cty.

21  Resp. to Req. for Admission Nos. 3–4, Orrell Decl. Ex. 9, ECF No. 86-1.  The County permitted

22  the City to burn waste in open trenches at the landfill before 1970.  *Id.* No. 54.  The County's

23  health officer advised the City about how to operate the dump in response to complaints.  *See*

24  Lincoln City Council Meeting Minutes (Oct. 24, 1961), Orrell Decl. Ex. 63, ECF No. 89-1.  The

25  County's health department concurred with the 1968 WDR.  Bourgault Dep. at 173–75, Orrell

26  Decl. Ex. 47, ECF No. 88-1; Marino Letter (Oct. 21, 1968), Orrell Decl. Ex. 66, ECF No. 89-1.

27  And later, the County helped ensure the landfill was properly closed.  *See* Farinha Dep. at 37,

28  154, Orrell Decl. Ex. 51, ECF No. 88-1.  This evidence could support a nuisance claim at trial.

26

1  *See, e.g.*, *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*, 221 Cal. App. 3d 1601,

2  1620 (1990) (finding an agreement to dispose of waste supported nuisance claim in similar

3  circumstances).

4        The County also argues the City's actions, not the County's actions, caused the nuisance,

5  citing a decision by another California district court.  Mem. Summ. J. at 15–16 (citing *W. Coast*

6  *Home Builders, Inc. v. Aventis Cropscience USA Inc.*, No. 04-2225, 2009 WL 2612380 (N.D.

7  Cal. Aug. 21, 2009)).  In *West Coast Home Builders*, the plaintiffs alleged one group of

8  defendants had created a nuisance by sending trash to a landfill.  *See* 2009 WL 2612380, at *8.  It

9  was undisputed, however, those defendants' "only role with respect to the Landfill was having

10  their waste taken there for the purposes of its disposal."  *Id.* at *9.  The City does not rely on such

11  thin evidence of the County's actions, as explained in detail above.

12        Lastly, the County argues the City consented to the disposal of wastes at the landfill.

13  Mem. at 16–17.  "Although consent may be a defense against a party that gave consent in a

14  private nuisance action, consent is not a defense to public nuisance."  *Tri-Dam v. Yick*,

15  No. 11-01301, 2016 WL 4061348, at *3 (E.D. Cal. July 28, 2016) (citing *Beck Dev. Co. v. S. Pac.*

16  *Transp. Co.*, 44 Cal. App. 4th 1160, 1215 (1996) and *Mangini v. Aerojet-Gen. Corp.*, 230 Cal.

17  App. 3d 1125, 1139 (1991)).  As for the City's private nuisance claim, because consent is a

18  defense, the County would have the ultimate burden at trial to prove the City gave consent.  *See,*

19  *e.g.*, *Beck*, 44 Cal. App. 4th at 1214–16 (reviewing relevant law).  To prevail on summary

20  judgment, then, the County must demonstrate the City's consent beyond controversy.  It has not

21  done so.  It is unclear, for example, whether the City consented to the disposal of waste that

22  leaked hazardous substances.  The City told regulators in the 1960s it did not believe it was

23  accepting waste containing "liquid or soluble chemicals of a toxic nature" at the landfill.

24  Obernholtzer Letter (Nov. 14, 1968), Parker Decl. Ex. 4, ECF No. 79-2.  Yet as the evidence

25  could now show, some of the waste deposited in the landfill contained toxic substances, and a

26  portion of that waste could be attributed to the County's residents at trial.  The court **denies** the

27  motion for summary judgment of this claim.

1          **D.      The City's Trespass Claim**

2          A defendant may be liable for trespass if it unlawfully interfered with the plaintiff's

3   possession of property. *Mangini*, 230 Cal. App. 3d at 1141. "Peaceable entry on land is not

4   actionable." *Id.* (quoting *Girard v. Ball*, 125 Cal. App. 3d 722, 788 (1981)). But a trespass may

5   occur if the defendant entered with limited consent and exceeded those limits. *Id.* The plaintiff

6   also can revoke its consent for some "structure, chattel, or other thing" that remains on its

7   property, and if the defendant "fails to remove it after the consent has been effectively

8   terminated," then it also may have trespassed. *Id.* (quoting Restatement (Second) Torts § 160)

9   omitted). In *Mangini*, for example, the plaintiffs alleged a person had wrongfully disposed of

10  hazardous substances on their property during the term of a lease agreement, and they alleged the

11  defendants had not cleaned up that waste as the lease required. *Id.* These allegations supported

12  their theory of an unlawful interference with their property. *Id.*

13         This court need not decide whether the City consented to the disposal of specific

14  hazardous substances at the landfill. Even if it did, the City also will argue at trial that it revoked

15  that consent. *See* Opp'n Summ. J. at 13. And it is possible that argument might win out. To be

16  sure, as the County points out, a plaintiff may not revoke its consent when it has effectively taken

17  ownership of the allegedly trespassing object. For example, someone who paints his home with

18  lead paint cannot fault the paint manufacturer for trespassing if he later discovers the dangers of

19  lead. *See Atl. Richfield Co.*, 137 Cal. App. 4th at 315. Products liability may be a superior theory

20  of fault in such cases. *See id.* (citing *Fibreboard Corp. v. Hartford Accident & Indemnity Co.*,

21  16 Cal. App. 4th 492, 512 (1993)). But the County has not shown this case falls within that

22  category as a matter of law. The City did not buy garbage and put it to use. The County paid the

23  City, and the City burned and buried the waste. The court **denies** the motion for summary

24  judgment on this claim as well.

25         **E.      The City's Equitable Contribution Claim**

26         Under the California Civil Code, "a party to a joint, or joint and several obligation, who

27  satisfies more than his share of the claim against all, may require a proportionate contribution

28  from all the parties joined with him." Cal. Civ. Code § 1432. The City claims the County must

28

1  contribute to the costs of its response to the water board's orders.  *See* First Am. Compl. ¶¶ 31–
2  33, 41; Opp'n Summ. J. at 13.

3        In response, the County argues the limitations period for such a claim has run.  *See* Mem.
4  Summ. J. at 19.  California law provides actions based on "a liability created by statute, other than
5  a penalty or forfeiture," must be brought within three years of the day they accrue.  Cal. Civ.
6  Proc. Code § 338(a).  A claim for contribution under section 1432 accrues when the plaintiff pays
7  more than its proportional share, "but not until then."  *Jackson v. Lacy*, 37 Cal. App. 2d 551, 559
8  (1940).  This action began on January 12, 2018, ECF No. 1, meaning the City may not seek
9  contribution for payments made before January 12, 2015.  The County has not shown all the costs
10  of the City's response were paid before that date, so the County is not entitled to summary
11  judgment based on the relevant limitations period.

12        The County also argues it is not jointly or severally liable with the City under section
13  1432.  Under the California Water Code, any person who has "caused or permitted . . . any waste
14  to be discharged or deposited . . . into the water of the state and creates . . . a condition of
15  pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the
16  effects of the waste."  Cal. Water Code § 13304(a).  California courts have interpreted this section
17  as imposing two requirements: (1) the person must have caused or permitted the discharge, and
18  (2) the discharge creates or threatens to create pollution or nuisance.  *San Diego Gas & Elec. Co.*
19  *v. San Diego Reg'l Water Quality Control Bd.*, 36 Cal. App. 5th 427, 431 (2019).  The regional
20  board may order one person to undertake this effort even if more than one person could be held
21  responsible under the terms of section 13304(a).  *Atl. Richfield Co. v. Cal. Reg'l Water Quality*
22  *Control Bd.*, 85 Cal. App. 5th 338, 374 (2022).  If the board does so order, then that person "can
23  seek contribution from other parties it believes also contributed to the pollution."  *Id.*

24        Here, the City has cited evidence that could show the County is liable under the terms of
25  Water Code section 13304(a) and Civil Code section 1432.  The County paid the City to allow
26  County residents from outside the City to use the landfill, thus relieving the County of any need
27  to operate its own landfill.  Long before this lawsuit began, this arrangement led at least one
28  person to describe the landfill as a "cooperative" effort.  Atteberry Letter (Jan. 30, 1964), Orrell

1    Decl. Ex. 24, ECF No. 87-1.  Discharges from the landfill entered the groundwater.  A reasonable

2    fact-finder could find that pollution and a nuisance were the result of the cooperative effort.  The

3    court **denies** the motion for summary judgment of this claim.

4         **F.    The County's CERCLA Section 113 Claims**

5         Finally, the County asserts a counterclaim for contribution under 42 U.S.C. § 9613(f)(1),

6    and asks the court for a declaration of the City's liability under 42 U.S.C. § 9613(g)(2).  *See* Am.

7    Answer & Countercl. at 13.  The County seeks summary judgment on those counterclaims.

8         Under CERCLA, "[a]ny person may seek contribution from any other person who is liable

9    or potentially liable under section 9607(a) of this title, during or following any civil action . . .

10   under section 9607(a) of this title."  42 U.S.C. § 9613(f)(1).  "In resolving contribution claims,

11   the court may allocate response costs among liable parties using such equitable factors as the

12   court determines are appropriate."  *Id.*  This court held in a related case about the same landfill

13   that the United States was entitled to partial summary judgment on an essentially identical

14   counterclaim against the City.  *See* Order at 20, *City of Lincoln v. United States*, No. 16-1164

15   (E.D. Cal. Aug. 31, 2020), ECF No. 95.  Nothing before it now causes the court to revisit that

16   decision and it orders similarly in this case.  The court **grants** the County's motion for summary

17   judgment to the same extent it granted the United States' motion in the related case.  If the City

18   prevails in its claims under § 9607(a), the County may seek contribution, and the court will

19   allocate response costs using appropriate equitable factors under § 9613(f)(1).

20   **V.    CONCLUSION**

21        The court resolves the pending motions as follows.  The City's motion to strike is **granted**

22   **in part** as described above.  The County's motion for leave to amend its answer and counterclaim

23   is **denied in part** as described above.  The County's motion for summary judgment on its

24   counterclaims under 42 U.S.C. §§ 7613(f)(1) and (g)(2) is **granted in part** as described above.

25   The County's motion for summary judgment on the City's claims is **denied**.

26        A Final Pretrial Conference is set for **May 19, 2023 at 10:00 a.m.** in Courtroom 3 before

27   Chief District Judge Kimberly J. Mueller.  The parties should be prepared to confirm a trial date

28   within 60 to 120 days from the date of the Final Pretrial Conference, and should be available for

1    trial accordingly.  The parties shall meet and confer and file a joint Pretrial Statement no less than

2    **three weeks prior** to the Final Pretrial Conference.  *See* E.D. Cal. L.R. 282.  The provisions of

3    Local Rule 281 shall apply with respect to the matters to be included in the joint pretrial

4    statement.  At least one of the attorneys who will conduct the trial for each of the parties shall

5    attend the Final Pretrial Conference.  All motions *in limine* must be filed in conjunction with the

6    joint pretrial statement.  In most cases, motions *in limine* are addressed and resolved on the

7    morning of the first day of trial.  The parties may alert the court at the Final Pretrial Conference

8    and in their final Joint Pretrial Statement that a particular motion or motions should be resolved

9    earlier.  At the Final Pretrial Conference, the court will set a briefing and hearing schedule on the

10    motions *in limine* as necessary.  The parties are reminded that a motion *in limine* is a pretrial

11    procedural device designed to address the admissibility of evidence.  The court looks with

12    disfavor upon dispositional motions presented at the Final Pretrial Conference or at Trial in the

13    guise of motions *in limine*.

14        This order resolves ECF Nos. 68, 73, 78 and 79.

15        IT IS SO ORDERED.

16    DATED:  April 3, 2023.

17  

                        CHIEF UNITED STATES DISTRICT JUDGE